(81 South. 367)

No. 22945.

BOWMAN–HICKS LUMBER CO. et al. v. TOWN OF OAKDALE.

(Dec. 2, 1918.)

*(Syllabus by the Court.)*

1. MUNICIPAL CORPORATIONS ⚇29(3) — ENLARGEMENT OF BOUNDARIES—NECESSITY.

Though 50 per cent. of the space within the limits of a small growing town may be unimproved, it does not follow that there can exist no necessity for the enlargement of the town's boundaries; and, even though no such necessity exist, such enlargement may be both advisable and reasonable.

2. MUNICIPAL CORPORATIONS ⚇29(3) — ENLARGEMENT OF BOUNDARIES—SITUATION.

Where a small growing town is surrounded by the mills of lumber companies, their property, including the quarters of their employés, touching its boundaries, and the people of the town and officers and employés of the companies live and work in such juxtaposition as to form a single community, it seems reasonable that they should all be subjected to the same police and sanitary regulations.

Appeal from Fifteenth Judicial District Court, Parish of Allen; Winston Overton, Judge.

Suit by the Bowman-Hicks Lumber Company and others against the Town of Oakdale to set aside an ordinance extending the town's corporate limits. Judgment for defendant, and plaintiffs appeal. Affirmed.

Pujo & Williamson and McCoy & Moss, all of Lake Charles, for appellants.

Edgar J. Elam, of Oakdale, and Williams & Williams, of Lake Charles, for appellee.

MONROE, C. J. [1] The Bowman-Hicks Lumber Company, Forest Lumber Company, Sabine River Lumber & Logging Company, and Industrial Lumber Company brought this suit (into which Robert Thiele came as an intervener, joining the plaintiffs), praying that an ordinance of the town of Oakdale, whereby it proposes to extend its corporate limits so as to include certain properties belonging to them, respectively, be decreed unreasonable, and hence unauthorized. The intervention was dismissed on exception, and the intervener has not appealed. The demands of the plaintiffs were rejected, and this appeal is prosecuted by them. The subjoined sketch,[1] reduced (with no pretensions either to completeness of detail or technical accuracy) from two large blueprints which have been filed in evidence, will show the present and proposed boundaries of the town and the juxtaposition in which the inhabitants of plaintiffs' properties and of the town site, respectively, live and do their work.

Plaintiffs' grounds of attack upon the ordinance are summarized in the brief filed in their behalf, substantially as follows: That the town has reached its full development and requires no additional territory; that 50 per cent. of its lots are unoccupied; that each of the plaintiffs established its plant without reference to the town, and has its own waterworks, electric light, and police; that plaintiffs' properties can derive no advantage from being included within the corporate limits, but will suffer the disadvantage of additional taxation, to which the owners object; that none of that property is for sale, nor will it be placed on the market, if so included; that law and order are better preserved thereon than within the town, but that the "Independent Quarters," which belong to neither of the plaintiffs, should be taken into the town for the better preservation of law and order; that no question of health or sanitation is involved; that plaintiffs now contribute largely to the town treasury by the payment of taxes on property already within the corporate limits; that the sole purpose of the ordinance here complained of is to bring in the corporate limits of Oakdale the valuable mill plants and property of the plaintiffs, in order to increase the revenues of the town. Counsel for

---

[1] See sketch on next page.

EXISTING BOUNDARY —
PROPOSED BOUNDARY —
BOWMAN-H. QUARTERS —

the town, by way of defense, allege the need of police protection and sanitary regulations about the mill plants and quarters; that the proposed extension represents the actual growth of the town; and that inhabitants of the town and of the territory included by the ordinance have become one community.

The evidence shows that in 1902 Oakdale was a village, or hamlet, with about 200 inhabitants; that in 1905 the population had increased to 1,000 or more, and it became a town, though so far as appears from the record, it could then boast of but one sawmill, which was a small affair. What progress it

made during the following six or seven years does not appear, but, some 5 years prior to the trial of this case (in October, 1917), some of the plaintiffs were induced to establish their plants upon their present sites, which were either donated by the town, or in one case paid for with money, part of which was contributed by it, and it was shown on the trial that the business brought by the mills since that time has constituted the bulk of the business done in the town, from which it was deduced by some of the witnesses that, when the mills finish cutting the timber which they control, the town will, at once, shrivel up and die—the utmost lease of life given to it, upon that theory, being, say, 12 years. The officers of the Bowman-Hicks Company testify that, at their present rate of cutting, they will finish in about 4 years, but it appeared upon cross-examination that they were then running their mill upon a war order, night and day, and since the war has now ended, it is possible that the speed will not hereafter be so great nor the hours so long, and the same thing is probably true as to the other plaintiffs, though counsel omitted to ask them whether they were filling war orders and making double time, and they fix the duration of their timber cutting at from 8 to 12 years. It is not unlikely, therefore, that the lives of the mills may be prolonged beyond the estimates made on the trial, and, even if the town is to die with them, that its life will be prolonged accordingly. The evidence, however, fails to satisfy us that the death of the town will be brought about in that way. It had been established and had attained some growth before the mills came. It is situated on the Iron Mountain railroad, at its junction with the Jasper & Eastern (also called the Santa Fé), which extends from Kirbyville, Tex., to that point, and is said (in the brief of defendant's counsel) to be intended to come through to New Orleans. Alexandria lies 40 miles in one direction and Lake Charles 60 miles in another, the nearest large town to the eastward being Opelousas, which is 50 miles away. The surrounding country produces cotton, corn, sugar cane, potatoes, ground peas, and other merchantable commodities, and it is shown that the citizens have held a stock show, or fair, from which it may be inferred that stock raising may be made profitable. It appears to us, therefore, that the pessimism of the plaintiffs as to the future of the town is somewhat overdrawn, and results from their considering the question only from their own point of view. The contemplated additions will about double the area of the town site, and plaintiffs argue that, as only about 50 per cent. of the present site is occupied, such additions are unnecessary. But an addition, as we take it, may be made to a town site, though not absolutely necessary, at the moment, if it be considered advisable with reference to other conditions and to the future.

[2] It is said in the testimony that the original site contains 570 acres, which are found in the S. ½ of S. ½ of section 3, and in section 10 save as indicated on the sketch, but from the space in that acreage available for residences there is to be deducted that occupied by the railroads and streets, public places and parks, and, if the population, when the ordinance was adopted, amounted to 3,500, as the witnesses seemed to think (say 700 families of five members each), it would appear that, for people expecting to enjoy the luxury of gardens and lawns, which usually pertains to small and to many large cities, the population of Oakdale have but little upon which to congratulate themselves, since the houses used for business purposes are also to be deducted from the space for residences. But, say the learned counsel, there is 50 per cent. of the land, constituting the present site which is unoccupied by building of any kind, and nothing

is to be gained by taking in plaintiffs' land, since it is not, and will not be, on the market. On the other hand, it is shown that part of that 50 per cent. is occupied by water at times, being low and marshy, and it is not improbable that part of it is held for prices that would-be builders are unwilling to pay, and other parts by absentees and minors and people who never sell real estate that they have once acquired; so that, upon the whole, 50 per cent. of unimproved land, in a country town, may be a comparatively small proportion, and particularly in a growing town, such as Oakdale; for, notwithstanding the allegation to the contrary and the gloomy speculations of the witnesses as to the future, we think the evidence shows that at the time of the trial it was entitled to be so classed. A contractor and builder testified that some 18 months before the trial he had made an addition and amended addition to the town in the S. W. ¼ of S. W. ¼ of section 3, and that he had met with all the success that he could have expected, having sold the property very rapidly. It is true that the so-called addition was made within the original corporate limits, but, if there was a lively demand for the property, such demand would indicate growth within the garments of the town. Another witness (real estate broker and agent) gave the following testimony:

"Q. How is the demand for real property in Oakdale? A. Very strong. Q. Is the demand greater than the supply or less? A. I find it greater. Q. In other words, not enough rent houses to meet the demand? A. No."

Another witness, engaged in the real estate business, testified that he moved to Oakdale in July, 1916, that he plotted a 10-acre tract just outside of the town and sold it, then a 5-acre tract, and sold that, and then sold a good portion of a 26-acre tract, plotted by another person; that he owns 22 houses near the hardwood mill, and meets with good success in renting them, and that in the Independent Quarters he could rent 20 to-morrow, if he had them. Another witness, called for plaintiff, who had been living in Oakdale for 11 years, engaged in the insurance business, was recalled to furnish information (as we infer) which he had been requested to obtain, and asked, "How many brick buildings are there in the town of Oakdale that are vacant at this time?" to which he replied:

"There is a building formerly occupied by the Oakdale State Bank that is vacant, and last night I noticed a building next to Fenkstein's store. Then there is an office in the front of the new brick theater, and there are two or three offices in the Oakdale State Bank building, up stairs, that are vacant, and there is, perhaps, an office vacant over the Standard Drug store."

Cross-examination:

"What is the cause of the brick building being vacant at this time? A. Calcasieu Bank moved to the Oakdale State Bank. * * * I think, about the 1st of June."

Beyond that, it is shown that there were a few negro houses for rent, but that a white man had had an agent endeavoring to procure a house for him for some time without success. It appears that plaintiffs have their waterworks, or wells, from which they supply their own employés, but it is not shown that they supply other people who live near their plant. One of the witnesses (a physician) testifies that he considered the sanitary condition of the Independent Quarters bad. He was asked, "Have you been in any of the other mill quarters?" to which he replied, "I have." He was then asked "What are the conditions in there?" to which counsel for plaintiffs objected that it assumed a fact not proved, and, the objection having been sustained, the question was not repeated, and remains unanswered, which does not prove, however, that the quarters of the plaintiffs are in good sanitary condition. The Inde-

pendent Quarters, as we understand the testimony, lie upon the east side of the town, in the N. E. ¼ of S. E. ¼ of S. E. ¼ of section 10, and in so much of section 11 as is shown on the sketch, and constitute a settlement in which most of the town negroes and many of those employed in the mills and upon the railroads have congregated. It is the scene of more disturbances and lawbreaking than any other place about or in the town, and its sanitary condition is shown to be bad. As may be seen, it lies in juxtaposition with, and partly surrounds, the negro quarters of the Bowman-Hicks Company. Upon the S. W. ¼ of S. W. ¼ of section 4 (N. W. corner of the sketch) is, or was, located a place of dives, blind tigers, and gambling establishments, called "Pegtown," or "Pegville," which appears to be as much in need of municipal regulation as the Independent Quarters. According to the evidence, plaintiffs maintain about as good order at their plants as is maintained in the town, but the situation is abnormal and open to serious objection. They, or some of them, each obtain a commission as deputy sheriff for one of their employés, who receives his compensation from, and discharges his functions under the direction of, their officers. In a case heretofore presented to this court, it appeared that a lumber company having a very large number of employés, constituting, with outsiders, much more of a town than Oakdale, found it necessary to maintain a private jail, or calaboose, in which its commissioned deputy incarcerated those whom he arrested. What the deputies of the plaintiffs do with their "arrests" is not shown, and that is an objectionable feature, since people living and working as a single community in other respects should be secured the same treatment when charged with offenses, but as matters here stand an act constituting an offense, when done by a citizen of Oakdale upon one side of an imaginary line may be no offense when done by an em-

ployé of the plaintiffs 12 inches away, on the other side of the same line, or, if regarded as an offense, may be treated differently, as the person making the arrest is acting under the directions of an officer of the law or of a mill superintendent. The officers and employés of the plaintiff companies constitute, as we take it, about a fourth, or perhaps a third, of the total population of Oakdale, including the proposed extension, or, say, in the proportion of 1,000 to 3,500; they live and work about as near to the citizens of the town as the citizens do to each other; are as likely to offend against the citizens and communicate bad morals and bad diseases to them as they are to receive these injuries; and we can see nothing unreasonable in requiring that both classes be subjected to the same law regulating those matters. There is no evidence in support of the allegation that the sole purpose of the ordinance is to bring within the corporate limits "the valuable property of the plaintiffs, in order to increase the revenues of the town." But if it be true, as we hold it to be, that, constituting members of the same community with the inhabitants they should be governed by the same law, it seems also reasonable that plaintiffs should contribute their quota to the expense of that government. In conclusion, we may say that, though there can be no doubt that the question of the reasonableness of a law, or ordinance, is of the very essence of legislation, and hence would seem to be one that it is no part of the function of the judiciary to determine, it is now well settled that the Legislature may confer upon agencies, such as municipal corporations, the power to enact reasonable legislation, within prescribed limits, and that it is for the courts to determine, in any given case, whether such agent has kept within, or has gone beyond, the limits of its mandate. N. O. & N. W. R. Co. v. Town of Vidalia, 117 La. 661, 42 South. 139, and authorities there cited. In the instant case, the learned judge

a quo states in his able opinion that he went over the most important parts of the new limits of the town of Oakdale, with representatives of both sides, and, finding that the evidence adduced, including the blueprints, truly reflects the situation, he held the ordinance here attacked to be reasonable. Our consideration of that evidence and of the argument of counsel has led us to the same conclusion.

The judgment appealed from is, therefore, Affirmed.

NOTE.—A rehearing was granted in this cause, but later on the case was compromised and dismissed on joint motion.